UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JOANNE REYES, *individually and on behalf of all others similarly situated*,

                              Plaintiff,

          v.

UPFIELD US INC.,

                              Defendant.

---

No. 22-CV-6722 (KMK)

OPINION & ORDER

---

Katherine Lalor, Esq.
Theodore Hillebrand, Esq.
Spencer Sheehan, Esq.
Sheehan & Associates, P.C.
Great Neck & Middle Village, NY
*Counsel for Plaintiff*

Darci F. Madden, Esq.
Courtney J. Peterson, Esq.
Nora Faris, Esq.
Bryan Cave Leighton Paisner LLP
New York, NY & St. Louis, MO
*Counsel for Defendant*

KENNETH M. KARAS, United States District Judge:

Plaintiff Joanna Reyes ("Plaintiff") brings this putative class action against Flora Flood US Inc., f/k/a Upfield US Inc. ("Defendant"),[1] alleging that the labeling on a variety of Defendant's Country Crock brand plant-based butter spreads is deceptive and misleading. (*See*

---

[1] Defendant legally changed its name from Upfield US Inc. to Flora Food US Inc. as of October 14, 2023. (*See* Dkt. No. 56; Dkt. No. 56-1.) Defendant represents that this change is to the "legal name only and does not constitute a change in corporate structure, the organization of Defendant as an entity, or the entity with which any alleged liability rests." (Dkt. No. 56.)

*generally* Compl. (Dkt. No. 1).)[2]  Plaintiff brings claims for damages against Defendant for

violations of §§ 349 and 350 of the New York General Business Law ("GBL"), N.Y. G.B.L.

§§ 349, 350.[3]  (*See id.* ¶¶ 79–82.)  Before the Court is Defendant's Motion for Summary

Judgment (the "Motion").  (*See* Def's Not. of Mot. (Dkt. No. 46).)  For the below reasons, the

Motion is granted.

## I.  Background

### A.  Factual Background

The Court has described the allegations and procedural history of this case in a prior

Opinion.  *See Reyes*, 694 F. Supp. at 415–17.  The Court therefore assumes familiarity with the

dispute and will provide factual and procedural background only as relevant to the instant

Motion.

The following facts are taken from Defendant and Plaintiff's statements pursuant to Local

Civil Rule 56.1, (Def's Local Rule 56.1 Statement ("Def's 56.1") (Dkt No. 49); Pl's Local Rule

56.1 Response ("Pl's Resp. 56.1") (Dkt. No. 52)),[4] as well as Plaintiff's Complaint and the

---

[2] Unless otherwise noted, the Court cites to the ECF-stamped page number in the upper-right corner of each page in cites from the record.

[3] Plaintiff also asserted claims for: (1) common law breach of express warranty; (2) common law fraud; (3) common law unjust enrichment; (4) common law breach of implied warranty; and (5) violations of the Magnuson Moss Warranty Act.  (*See* Compl. ¶¶ 87–106.) Plaintiff voluntarily withdrew her claims for breach of implied warranty and violations of the Magnuson Moss Warranty Act.  (*See* Letter from Katherine Lalor, Esq., to Court (October 13, 2022) (Dkt. No. 12).)  Plaintiff's claims for express warranty, fraud, and unjust enrichment were dismissed by this Court's September 26, 2023, Order.  *See Reyes v. Upfield US Inc.*, 694 F. Supp. 3d 408, 432 (S.D.N.Y. 2023).

[4] In response to Defendant's 56.1 Statement, Plaintiff filed a Response 56.1 Statement that fails to comply with the Court's Individual Rules of Practice § II.D, which requires that the opposing party "must reproduce each entry in the moving party's Rule 56.1 Statement and set out the opposing party's response directly beneath it."  Instead, Plaintiff simply numbers its

admissible evidence submitted by the Parties.  The facts are recounted "in the light most

favorable to" Plaintiff, the non-movant.  *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d

Cir. 2018) (citation and quotation marks omitted).  The facts as described below are in dispute

only to the extent indicated.[5]

    1.  <u>The Product</u>

Defendant is "the world's largest manufacturer of margarines and vegetable oil spreads,"

which has its principal place of business in Hackensack, New Jersey.  (*See* Compl. ¶¶ 56–57.)  In

the first quarter of 2019, Defendant began selling 10.5-ounce tubs of Country Crock Plant Butter

featuring almond oil ("the Product").  (Def's 56.1 ¶¶ 1–2; Pl's Resp. 56.1 ¶¶ 1–2.)  The

Product—which was dairy free, as indicated on every version of the Product's front label—was a

---

admissions or denials in bullet form.  (*See* Pl's Resp. 56.1.)  Plaintiff's "failure to reproduce
[Defendant's] Rule 56.1 Statement defeats the purpose of [the Court's] individual [rule], which
is designed to obviate the need to go back and forth between the two Rule 56.1 Statements."
*Gilani v. Teneo, Inc.*, No. 20-CV-1785, 2021 WL 3501330, at *1 n.1 (S.D.N.Y. Aug. 4, 2021).
The Court cautions Plaintiff that compliance with local rules and individual rules of practice is
not a matter to be taken lightly or ignored.

[5] Where the Parties identify disputed facts but with semantic objections only or by
asserting irrelevant facts, which do not actually challenge the factual substance described in the
relevant paragraphs, the Court will not consider them as creating disputes of fact.  *See Baity v.
Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) ("Many of [the] [p]laintiff's purported
denials—and a number of [its] admissions—improperly interject arguments and/or immaterial
facts in response to facts asserted by [the] [d]efendant[], often speaking past [the] [d]efendant['s]
asserted facts without specifically controverting those same facts. . . .  [A] number of [the]
[p]laintiff's purported denials quibble with [the] [d]efendant['s] phraseology, but do not
address the factual substance asserted by [the] [d]efendant[].");  *Pape v. Bd. of Educ. of
Wappingers Cent. Sch. Dist.*, No. 07-CV-8828, 2013 WL 3929630, at *1 n.2 (S.D.N.Y. July 30,
2013) (explaining that the plaintiff's 56.1 statement violated the rule because it "improperly
interjects arguments and/or immaterial facts in response to facts asserted by [the] [d]efendant,
without specifically controverting those facts," and "[i]n other instances, . . . neither admits nor
denies a particular fact, but instead responds with equivocal statements");  *Goldstick v. The
Hartford, Inc.*, No. 00-CV-8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (noting that
the plaintiff's 56.1 statement "does not comply with the rule" because "it adds argumentative and
often lengthy narrative in almost every case[,] the object of which is to 'spin' the impact of the
admissions [the] plaintiff has been compelled to make").

plant-based and vegan alternative for dairy butter for cooking, baking, and spreading. (Def's 56.1 ¶¶ 4–5; Pl's Resp. 56.1 ¶¶ 4–5.) At all times it was sold, the Product label either indicated that it had a "rich and creamy taste" or "TASTES LIKE BUTTER." (Def's 56.1 ¶ 6; Pl's Resp. 56.1 ¶ 6.)

The Product contained 79% vegetable oil by weight and was solid and spreadable at room temperature, a consistency attributable to the proportions of the oils in the Product's blend of plant-based oils. (Def's 56.1 ¶¶ 3, 7–8; Pl's Resp. 56.1 ¶¶ 3, 7–8.) A 79% vegetable oil spread like the Product needs to contain a relative proportion of fats that are solid at room temperature, such as palm fruit and palm kernel oil, compared to oils that are liquid at room temperature, such as soybean and almond oil, to maintain the desired solid and spreadable consistency. (Def's 56.1 ¶ 9; Pl's Resp. 56.1 ¶ 9; Decl. of Whitney Gaudet in Supp. of Mot. ¶ 11 ("Gaudet Decl.") (Dkt. No. 47).)

The first version of the Product, which was launched in early 2019, included the statements "Made with Almond Oil" and "79% vegetable oil spread" on the front label, and featured a vignette of a few almonds in the upper righthand corner. (Def's 56.1 ¶¶ 12, 14; Pl's Resp. 56.1 ¶¶ 12, 14; Gaudet Decl. Ex. 1 (Dkt. 47-1).) The phrase "79% vegetable oil spread" was printed in type that was the same height as the words "Almond Oil." (Def's 56.1 ¶ 13; Pl's Resp. 56.1 ¶ 13; Gaudet Dec. Ex. 1.)



(Gaudet Decl. Ex. 1.)

Early in the second quarter of 2019, Defendant launched an updated tub and label for the Product that read "Country Crock Plant Butter With Almond Oil," which included the statement "79% plant-based oil spread" on the tub front label and a vignette with a few almonds, leaves, and a single almond flower in the upper righthand corner.  (Def's 56.1 ¶¶ 15, 17; Pl's Resp. 56.1 ¶¶ 15, 17; Gaudet Decl. Ex. 2 (Dkt. 47-2).)  The "79% vegetable oil spread" disclosure on this version of the Product was also printed in type that was the same height as the words "Almond Oil."  (Def's 56.1 ¶ 16; Pl's Resp. 56.1 ¶ 16; Gaudet Dec. Ex. 2.)



(Gaudet Decl. Ex. 2.)

In early 2020, Defendant released another revised version of the tub and label, removing the statement "New!" from the front panel and adding the statement "cooks and tastes like butter" on the right-side panel of the tub.  (Def's 56.1 ¶ 18; Pl's Resp. 56.1 ¶ 18; Gaudet Decl. Ex. 3 (Dkt. 47-3).)



(Gaudet Decl. Ex. 3.)

At all times since the Product was initially launched, almond oil was used as an ingredient in the Product and the back label of the tub contained the Product ingredient list, which identified the ingredients in order of predominance by weight (as required by U.S. Food & Drug Administration "(FDA)" regulations). (Def's 56.1 ¶¶ 19–20; Pl's Resp. 56.1 ¶¶ 19–20.) Beginning with the initial version of the Product from early 2019, the ingredient list on the back of the tub disclosed that almond oil was the third most predominant of the four oils in the Product's blend of plant-based oils, behind soybean and palm kernel oils and before palm fruit oil. (Def's 56.1 ¶ 21; Pl's Resp. 56.1 ¶ 21.)

Defendant ceased production of the Product labeled "Made with Almond Oil" in the early second quarter of 2019. (Def's 56.1 ¶ 25; Pl's Resp. 56.1 ¶ 25; Gaudet Decl. ¶ 27.) Any units of the "Made with Almond Oil" Product in circulation at the end of 2019 would have passed the six-month "best before" date marked on the Product, which provides notice to retailers to replace the Product with fresh inventory before that date. (Def's 56.1 ¶¶ 23–25; Pl's Resp. 56.1 ¶¶ 23–25; Gaudet Decl. ¶¶ 24–27.) Defendant discontinued the Product in July 2022. (Def's 56.1 ¶ 26; Pl's Resp. 56.1 ¶ 26.)

2. <u>Plaintiff's Purchase and Use of the Product</u>

Plaintiff testified that she does not recall exactly when she first purchased the Product but believes that she first used it "[s]ome time back in 2020." (Pl's Opp'n Ex. 1 at 84:4–11 ("Dep. of J. Reyes") (Dkt. No. 51-1); Def's 56.1 ¶ 30; Pl's Resp. 56.1 ¶ 30.)[6] Plaintiff purchased the "With Almond Oil" version of the Product, which she recalled purchasing "only two times," (Dep. of J. Reyes at 88:18–24; Def's 56.1 ¶¶ 29, 32; Pl's Resp. 56.1 ¶¶ 29, 32), the second of which "might" have occurred in 2022, (Dep. of J. Reyes at 91:16–24; Def's 56.1 ¶ 31; Pl's Resp.

---

[6] Citations to deposition transcripts reference the internal page and line numbers therein.

56.1 ¶ 31).  Plaintiff testified that she had not seen advertisements for the Product, including any advertisements regarding the amount of almond oil in the Product, (Dep. of J. Reyes at 84:12–17, 143:22–44:7; *see also* Def's 56.1 ¶ 27; Pl's Resp. 56.1 ¶ 27), but that she purchased the Product because she was "trying to eat healthy" and was looking for a "plant-based option" for cooking and spreading on toast, (Dep. of J. Reyes at 104:25–05:21; *see also* Def's 56.1 ¶ 39; Pl's Resp. 56.1 ¶ 39).

Before purchasing the Product, Plaintiff testified that she determined it was a "healthy alternative" by checking the caloric content listed on the back label.  (Dep. of J. Reyes 112:2–13:3.)  Plaintiff acknowledges that she did not check the ingredient list on the back label of the Product to verify it was healthy, instead having her "attention just grabbed to the plant butter" reference on the front label.  (Dep. of J. Reyes at 127:9–13; Def's 56.1 ¶ 42; Pl's Resp. 56.1 ¶ 42.)  Plaintiff stated she "sometimes" reviews products' back labels and ingredient lists to determine whether or not a product is healthy, (Dep. of J. Reyes at 126:24–127:8; Def's 56.1 ¶ 43; Pl's Resp. 56.1 ¶ 43), although she does not "usually" do so, (Dep. of J. Reyes at 111:17–21).

Plaintiff testified she would have purchased the Product at a Shoprite grocery store, but she was unable to recall which one as she "go[es] to so many of them."  (*Id.* at 85:3–7; Def's 56.1 ¶ 33; Pl's Resp. 56.1 ¶ 33.)  Plaintiff does not use a Shoprite store shopper card, loyalty account, delivery app, or other system that would have documented her purchases of the Product.  (Def's 56.1 ¶ 36; Pl's Resp. 56.1 ¶ 36.)  Plaintiff does not recall exactly what she paid for the Product but testified that she believes she paid "about $5" for it in 2022 and did not remember paying "any other amount" for it in 2020.  (Dep. of J. Reyes at 93:3–9; Def's 56.1 ¶ 38; Pl's Resp. 56.1 ¶ 38.)  Plaintiff also testified that she paid for the Product in cash, as she

does not purchase groceries using any kind of credit, debit, or gift card.  (Def's 56.1

¶¶ 34–35; Pl's Resp. 56.1 ¶¶ 34–35.)  Plaintiff testified that she did not retain any receipts for her

purchases of the Product, as her general practice is to "[t]hrow [receipts] in the garbage" on the

same day she does her shopping.  (Dep. of J. Reyes at 92:14–93:2; Def's 56.1 ¶ 37; Pl's Resp.

56.1 ¶ 37.)

       Plaintiff also testified that she expected the Product "should taste like almond," but when

she "put it on [her] bread, it didn't taste like too much almond," (Dep. of J. Reyes at

119:14–20:21).  Despite her expectation that "[m]ost of [the oil] in the Product should have been

almond," (*id.* at 118:7–11), she now, after use, does not "believe there's almond oil in the actual

product," (*id.* at 51:22–53:4).  Plaintiff, however, admitted that almond oil is listed in the

ingredients list on the back of the Product.  (*Id.* at 110:3–13.)

       3.  Plaintiff's Allegations and Expert Witnesses

       Plaintiff alleges that labeling the Product as "Made With Almond Oil" and "With

Almond Oil," and including pictures of almonds on the labels, led her and other consumers to

"expect a significant, non-*de minimis* amount of almond oil, in relative and absolute amounts to

all oils used."  (Def's 56.1 ¶ 44 (quoting Compl. ¶¶ 39, 62); Pl's Resp. 56.1 ¶ 44.)  Although

Plaintiff admitted that the Product contained "some amount of almond oil," (Dep. of J. Reyes at

139:9–14; Def's 56.1 ¶ 45; Pl's Resp. 56.1 ¶ 45), she testified that she believed the Product

should have contained "*mostly* almond [oil]," (Dep. of J. Reyes at 83:12–16), or "more almond

than other oil," (*id.* at 139:20–23 (emphasis added); Def's 56.1 ¶ 46; Pl's Resp. 56.1 ¶ 46).

Plaintiff also testified that she wanted the Product to have "[m]ore almond flavor," but

acknowledged that nothing on the Product label indicated it was supposed to taste like almonds.

(Dep. of J. Reyes at 123:8–18.)

In support of her allegations, Plaintiff produced the opinions of two expert witnesses: Dr. Andrea Lynn Matthews, Ph.D. (who opined on consumer deception) and Dr. William Ingersoll, Ph.D. (who opined on Plaintiff's price-premium theory of injury).  (Def's 56.1 ¶¶ 50, 105; Pl's Resp. 56.1 ¶¶ 50, 105; Decl. of Andrea Matthews ("Matthews Decl") (Dkt. No. 48-4); Decl. of Willian Ingersoll ("Ingersoll Decl.") (Dkt. No. 48-5.)  Plaintiff disclosed both experts on July 23, 2024, almost four weeks after the Court's deadline for Plaintiff to disclose experts.  (Def's 56.1 ¶¶ 52–53, 107–08; Pl's Resp. 56.1 ¶¶ 52–53, 107–08; *see also* Amended Case Mgmt. Plan & Scheduling Order 2 (Dkt. No. 33) (setting June 26, 2024, as the deadline for Plaintiff's expert disclosures).)

B.  Procedural History

On December 15, 2022, Defendant moved to dismiss the Complaint.  (*See* Dkt. Nos. 17–18.)  On September 26, 2023, the Court issued an Opinion and Order granting Defendant's motion to dismiss multiple of Plaintiff's claims (specifically, her claims for common law breach of express warranty, common law fraud, and common law unjust enrichment) and denying Defendant's motion as to Plaintiff's claims under §§ 349 and 350 of the GBL.  *Reyes*, 694 F. Supp. 3d at 432.

Following the Court's Order, the Parties jointly submitted a proposed Case Management Plan and Scheduling Order, which contained competing proposed briefing schedules for class certification.  (Dkt. No. 25.)  On December 31, 2023, the Court adopted Plaintiff's proposed schedule, which provided that Plaintiff's expert disclosures were due no later than June 26, 2024, Defendant's expert disclosures were due no later than July 31, 2024, and all expert discovery and depositions would be completed no later than August 14, 2024.  (Dkt. No. 26 at 2.)

On June 10, 2024, Defendant filed a pre-motion letter seeking leave to file a Motion for Summary Judgment upon the close of discovery and requesting a stay of class certification briefing pending a decision on summary judgment. (Dkt. No. 34 at 1.) Plaintiff responded to Defendant's pre-motion letter on June 17, 2024. (Dkt. No. 35.) After holding a pre-motion conference on June 24, 2024, the Court directed Defendant to submit an updated pre-motion later by no later than two weeks after expert discovery was completed. (*See* Dkt. (Minute Entry for June 24, 2024).) Defendant filed a renewed pre-motion letter on July 23, 2024, again seeking leave to file a Motion for Summary Judgment and requesting a stay of class certification briefing. (Dkt. No. 37 at 1.) In the letter, Defendant noted that "Plaintiff's deadline to serve any expert disclosures was June 26, 2024, and Plaintiff elected not to disclose any experts." (*Id.*) The following day, Defendant filed an amended version of its letter to inform the Court that after Defendant filed its renewed pre-motion letter, Plaintiff disclosed her experts. (Dkt. No. 39 at 1.) Characterizing these disclosures as "late and wholly inadequate," Defendant asked the Court to preclude Plaintiff's experts as untimely. (*Id.*) Plaintiff responded on July 26, 2024, asserting that she had inadvertently not disclosed her experts on time because Plaintiff's counsel mistakenly "believed that the deadline for expert discovery was stayed concurrently with the deadline for class certification." (Dkt. No. 40 at 1.)

The following day, the Court set a briefing schedule for summary judgment. (Dkt. No. 41.) Defendant filed another letter on August 2, 2024, seeking a pre-motion conference to discuss its request to strike Plaintiff's expert disclosures. (Dkt. No. 42.) After Plaintiff responded to Defendant's letter, (Dkt. No. 44), the Court scheduled a pre-motion conference for September 9, 2024, (Dkt. No. 45 (Memo Endorsement)), at which the Court made clear that the

Parties could address the expert disclosure issue through their summary judgment briefing, (*see* Dkt. (Minute Entry for Sept. 9, 2024)).

Defendant filed its Motion on August 27, 2024. (*See* Def's Not. of Mot.; Gaudet Decl.; Decl. of Courtney Peterson, Esq. in Supp. of Mot. ("Peterson Decl.") (Dkt. No. 48); Def's 56.1; Def's Mem. of Law in Supp. of Mot. ("Def's Mem.") (Dkt. No. 50).) Plaintiff filed her Opposition on September 30, 2024. (*See* Pl's Mem. in Opp'n to Mot. ("Pl's Opp'n") (Dkt. No. 51); Pl's Resp. 56.1; Decl. of Jerome Schindler, Esq. in Opp'n to Mot. ("Schindler Decl.") (Dkt. No. 53).) On October 29, 2024, Defendant filed its Reply. (Def's Reply Mem. of Law in Further Supp. of Mot. ("Reply") (Dkt. No. 54); Decl. of Darci Madden, Esq. in Supp. of Mot. ("Madden Decl.") (Dkt. 55).)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) (same); *Truitt v. Salisbury Bank & Tr. Co.*, 52 F.4th 80, 85 (2d Cir. 2022) (same); *Cambridge Funding Source LLC v. Emco Oilfield Servs. LLC*, No. 22-CV-10741, 2023 WL 7405862, at *4 (S.D.N.Y. Nov. 9, 2023) (same). "In deciding whether to award summary judgment, the court must construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in [her] favor." *Torcivia v. Suffolk County*, 17 F.4th 342, 354 (2d Cir. 2021); *see also Horror Inc. v. Miller*, 15 F.4th 232, 240 (2d Cir. 2021) (same).

"The movant 'bears the initial burden of showing that there is no genuine dispute as to a material fact.'" *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (quoting

*Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018)); *see also LaFontant v. Mid-Hudson Forensic Psychiatric Ctr.*, No. 18-CV-23, 2023 WL 6610764, at *7 (S.D.N.Y. Oct. 10, 2023) (same); *Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4 (S.D.N.Y. Feb. 20, 2020) (same). "However, when the burden of proof at trial would fall on the non[-]moving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim," in which case "the non[-]moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration adopted) (internal quotation marks and citation omitted); *see also U.S. Bank Nat'l Ass'n as Tr. for Reg. Holders of J.P. Morgan Chase Com. Mortg. Sec. Corp., Multifamily Mortg. Pass-Through Certificates, Series 2017-SB42 v. 160 Palisades Realty Partners LLC*, No. 20-CV-8089, 2022 WL 743928, at *3 (S.D.N.Y. Mar. 10, 2022) (same).

Importantly, "[t]o survive a [summary judgment] motion . . . , [a non-movant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)); *see also Jennifer Fung-Schwartz, D.P.M, LLC v. Cerner Corp.*, No. 17-CV-233, 2023 WL 6646385, at *3 (S.D.N.Y. Oct. 12, 2023) (same), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Kollias v. Univ. of Rochester*, No. 18-CV-6566, 2023 WL 5608868, at *4 (W.D.N.Y. Aug. 30, 2023) ("When a motion for summary judgment is properly

supported by documents or other evidentiary materials, the party opposing summary judgment

may not merely rest on the allegations or denials of his pleading." (quoting *Wright v. Goord*, 554

F.3d 255, 266 (2d Cir. 2009))).

"On a motion for summary judgment, a fact is material if it might affect the outcome of

the suit under the governing law." *Seward*, 2023 WL 6387180, at *12 (quoting *Royal Crown*

*Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014)). "At

this stage, 'the role of the court is not to resolve disputed issues of fact but to assess whether

there are any factual issues to be tried.'" *U.S. Sec. & Exch. Comm'n v. Amah*, No. 21-CV-6694,

2023 WL 6386956, at *8 (S.D.N.Y. Sept. 28, 2023) (alteration adopted) (quoting *Brod v. Omya,*

*Inc.*, 653 F.3d 156, 164 (2d Cir. 2011)). Therefore, "a court's goal should be 'to isolate and

dispose of factually unsupported claims.'" *Sullivan v. Nat'l Express LLC*, No. 21-CV-5789,

2023 WL 6279255, at *8 (S.D.N.Y. Sept. 26, 2023) (quoting *Geneva Pharms. Tech. Corp. v.*

*Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex Corp.*, 477 U.S. at 323–24)).

When ruling on a motion for summary judgment, a district court should "consider only

evidence that would be admissible at trial." *Latimer v. Annucci*, No. 21-CV-1275, 2023 WL

6795495, at *3 (S.D.N.Y. Oct. 13, 2023) (citing *Nora Beverages, Inc. v. Perrier Grp. of Am.,*

*Inc.,* 164 F.3d 736, 746 (2d Cir. 1998)). "[W]here a party relies on affidavits or deposition

testimony to establish facts, the statements must be made on personal knowledge, set out facts

that would be admissible in evidence, and show that the affiant or declarant is competent to

testify on the matters stated." *Mozzochi v. Town of Glastonbury*, No. 21-CV-1159, 2023 WL

3303947, at *3 (D. Conn. May 8, 2023) (quoting *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir.

2012)); *accord* Fed. R. Civ. P.56(c)(4); *see also E. Fishkill Fire Dist. v. Ferrara Fire Apparatus,*

*Inc.*, No. 20-CV-576, 2023 WL 6386821, at *11 (S.D.N.Y. Sept. 28, 2023) ("Rule 56 requires a

motion for summary judgment to be supported with affidavits based on personal knowledge . . . ." (internal citation omitted)); *Baity*, 51 F. Supp. 3d at 419 (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (internal citation omitted)).

### B.  Analysis

Defendant contends that summary judgment is warranted because Plaintiff has not offered sufficient evidence to create a triable issue of fact as to two essential elements of her claims under GBL §§ 349 and 350: whether Plaintiff has demonstrated that she suffered actual injury and that Defendant engaged in materially misleading conduct.  (Def's Mem. 12–18, 28–30.)  In so arguing, Defendant also seeks to exclude one of Plaintiff's expert reports—that of Dr. Matthews—as "unreliable, irrelevant, and inadmissible."  (*Id.* at 19.)  The Court need not address the admissibility of the Matthews report, however, as even assuming the report is admissible, Plaintiff has still failed to identify a triable issue of fact sufficient to survive summary judgment.[7]

---

[7] Defendant also seeks to strike all of Plaintiff's expert evidence as untimely, as Dr. Ingersoll and Dr. Matthews were not disclosed as experts until nearly four weeks after the Court-ordered deadline.  (Def's Mem. 11–16.)  Because excluding expert testimony is a "drastic remedy" that should be "used sparingly, even when there has not been strict compliance with" the Federal Rules, *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 398–99 (S.D.N.Y. 2015) (internal quotation marks omitted), and because the Court finds summary judgment is warranted even if the expert reports are considered, the Court will not strike the Ingersoll and Matthews reports.  However, the Court notes that this is not the first time Plaintiff's counsel has untimely submitted expert disclosures.  Given that Plaintiff's counsel has had multiple expert reports stricken as untimely in this District alone, counsel has no excuse for non-compliance with this Court's deadlines.  *See Kelly v. Beliv LLC*, No. 21-CV-8134, 2024 WL 1076217, at *7–8 (S.D.N.Y. Mar. 12, 2024) (striking Dr. Matthews' report);

1. Actual Injury

"[A] plaintiff must prove 'actual' injury . . . , though not necessarily pecuniary harm" to recover under GBL §§ 349 or 350.[8]  *Kelly*, 2024 WL 1076217, at \*9 (citing *Stutman v. Chem. Bank*, 731 N.E.2d 608, 612 (N.Y. 2000)); *Rodriguez v. It's Just Lunch, Int'l*, No. 07-CV-9227, 2010 WL 685009, at \*9 (S.D.N.Y. Feb. 23, 2010) ("A plaintiff seeking redress through [GBL] § 349 must show that the defendant engaged in a material deceptive act or practice that causes actual, although not necessarily pecuniary, harm." (internal quotation marks and citations omitted)); *see also Wynn v. Topco Assocs., LLC*, No. 19-CV-11104, 2021 WL 168541, at \*2 (S.D.N.Y. Jan. 19, 2021) (noting that, to state a claim under GBL §§ 349 or 350, "a plaintiff

---

Transcript of Oral Argument at 19:23–20:3, *Colpitts v. Blue Diamond Growers*, No. 20-CV-2487 (S.D.N.Y. Jan. 27, 2023), ECF No. 104 (striking Dr. Matthews' report).  As for the Plaintiff's third expert report—that of Jerome R. Schindler, Esq.—Plaintiff never disclosed this expert in discovery or indeed, identified his existence at all until Plaintiff filed the Schindler report along with her Opposition to the instant Motion.  (*See* Schindler Decl.; Reply 9.)  Moreover, Plaintiff never cites to this report in her brief or otherwise explains its relevance.  Accordingly, the Court will not consider this report in deciding this Motion.

 Further, as Defendant points out, these untimely disclosures are indicative of Plaintiff's counsel's well-established history of flouting court rules.  (*See* Reply 10–11 (collecting cases where Plaintiff's counsel was sanctioned, held in civil contempt, or warned against breaking the rules).)  *See Guzman v. Walmart Inc.*, No. 22-CV-3465, 2023 WL 4535903, at \*4 (N.D. Ill. May 15, 2023) ("Plaintiff's counsel has become a wrecking ball when it comes to imposing attorneys' fees on other people.  And this Court is starting to wonder who should pay for the cleanup.  At some point, even lawyers have to internalize the costs of their own behavior.").  Counsel is on notice that further non-compliance in front of this Court—in this Action or any other—will not be tolerated.

[8] The standard for recovery under . . . § 350, while specific to false advertising, is otherwise identical to [§] 349,' and therefore the Court will merge its analysis of the two claims." *Cosgrove v. Oregon Chai, Inc.*, 520 F. Supp. 3d 562, 575 (S.D.N.Y. 2021) (citation omitted) (quoting *Goshen v. Mut. Life Ins. Co. of N.Y.*, 774 N.E.2d 1190, 1195, n.1 (N.Y. 2002)); *see also Barreto v. Westbrae Nat., Inc.*, 518 F. Supp. 3d 795, 802 (S.D.N.Y. 2021) (same); *Duran v. Henkel of Am., Inc.*, 450 F. Supp. 3d 337, 346 (S.D.N.Y. 2020) (noting that "courts have found that the scope of § 350 is as broad as that of § 349 . . . and that its essential elements are the same" (ellipses in original)).

must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice" (citing *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015))).  "A plaintiff suffers actual injury if, 'on account of a materially misleading practice, she purchased a product and did not receive the full value of her purchase.'" *Colpitts v. Blue Diamond Growers*, No. 20-CV-2487, 2023 WL 2752161, at *4 (S.D.N.Y. Mar. 31, 2023) (quoting *Duran v. Henkel of Am., Inc.*, 450 F. Supp. 3d 337, 350 (S.D.N.Y. 2020)).

"One method of demonstrating actual injury in the consumable goods context"—and the only method Plaintiff has opted to use here, (Def's 56.1 ¶ 104 (citing Peterson Decl. Ex. 5, Pl's Responses and Objections to Def's First Set of Interrogatories (Dkt. No. 48.2)); Pl's 56.1 ¶ 104 (same))—"is by showing that the plaintiff paid a 'price premium'—that is, as a result of the defendant's deception, the plaintiff paid more for a product than [s]he otherwise would have," *Eidelman v. Sun Prods. Corp.*, No. 21-CV-1046, 2022 WL 1929250, at *1 (2d Cir. June 6, 2022) (summary order); *see also Colpitts*, 2023 WL 2752161, at *4 (noting a price premium theory "is satisfied by [showing] 'an overpayment, or price premium, whereby a plaintiff pays more than she would have but for the deceptive practice'" (quoting *Duran*, 450 F. Supp. 3d at 350)); *Passman v. Peloton Interactive, Inc.*, 671 F. Supp. 3d 417, 453 (S.D.N.Y. 2023) (explaining that injuries caused by deceptive practices may be alleged either by showing that plaintiff paid a price premium or that plaintiff "was exposed to a material deceptive act and relied on that misrepresented fact to her detriment").

Plaintiff has introduced no evidence supporting her allegation that the Product commanded a price premium relative to comparable products that lacked the alleged false and misleading labels.  Plaintiff's sole evidence that the Product was sold at a price premium is the

expert opinion of Dr. Ingersoll, who submitted a "proposed methodology" to use conjoint and hedonic pricing analyses to measure the amount consumers would be willing to pay for the Product if they believed it contained at least the same amount of almond oil as any other oil. (Ingersoll Decl. ¶¶ 9, 11–12; Def's 56.1 ¶ 111; Pl's 56.1 ¶ 111.) Dr. Ingersoll noted that, to conduct those analyses, he would "need to either find a relevant data set or gather data [them]selves . . . consist[ing] of different products and their characteristics[,]" which "could be collected in various ways including retail product price surveys, review of online vendors, and perhaps from wholesalers or the producers directly." (Ingersoll Decl. ¶ 36; Def's 56.1 ¶ 115; Pl's 56.1 ¶ 115.) Notably, Dr. Ingersoll did not actually collect this data, conduct these analyses, or perform any calculations using his proposed methodology, let alone any other calculations that could demonstrate a price premium for the Product attributable to the alleged mislabeling. (Ingersoll Decl. ¶¶ 38–39; Def's 56.1 ¶ 116; Pl's 56.1 ¶ 116.) Dr. Ingersoll also did not opine on whether Plaintiff ever actually paid a price premium for the Product, although he "reserve[d] the right to update this analysis" "[i]f new information bec[ame] available." (Ingersoll Decl. ¶¶ 38–39; Def's 56.1 ¶ 117; Pl's 56.1 ¶ 117.) Because Dr. Ingersoll has not conducted any of the analyses he proposes, (Ingersoll Decl. ¶ 38), his report is pure speculation and is insufficient to establish injury, *Kelly*, 2024 WL 1076217, at *10 ("[A] proposal to identify evidence at some yet-to-be-determined date is not sufficient to survive summary judgment when [p]laintiff is required to come forward with admissible evidence to raise a genuine issue of fact for trial."); *Segovia v. Vitamin Shoppe, Inc.*, No. 14-CV-7061, 2017 WL 6398747, at *4 (S.D.N.Y. Dec. 12, 2017) ("[A] party 'cannot overcome summary judgment by relying on mere speculation or conjecture as to the true nature of the facts because conclusory allegations or denials cannot by

themselves create a genuine issue of material fact where none would otherwise exist.'" (quoting *Miller v. City of New York*, 700 Fed. App'x 57, 58 (2d Cir. 2017) (summary order)).[9]

Apart from Dr. Ingersoll's flawed testimony, Plaintiff has offered no other evidence of actual injury.[10]  Plaintiff originally alleged the "Product [was] sold at a premium price, approximately no less than $3.99."  (Compl. ¶ 47.)  But Plaintiff has not provided anything to support that allegation.  In her deposition, she testified that she "think[s]" she paid "about $5" the second time she purchased the Product but could not recall if she paid any different in 2020. (Dep. of J. Reyes at 93:3–9; Def's 56.1 ¶ 38; Pl's Resp. 56.1 ¶ 38.)  There is no way of verifying the amount Plaintiff actually paid on either occasion, as she testified she paid in cash, (Def's 56.1 ¶¶ 34–35; Pl's Resp. 56.1 ¶¶ 34–35), does not retain any receipts, (Dep. of J. Reyes at 92:14–93:2; Def's 56.1 ¶ 37; Pl's Resp. 56.1 ¶ 37), does not belong to any store loyalty programs or use an apps or delivery services that might track her purchases, (Def's 56.1 ¶ 36; Pl's Resp.

---

[9] In an attempt to bolster Dr. Ingersoll's report, Plaintiff cites various cases wherein courts accepted proposed, but not yet conducted, conjoint analyses.  (*See* Pl's Opp'n 26–27 (citing *de Lacour v. Colgate-Palmolive Co.*, 338 F.R.D. 324, 345 (S.D.N.Y. 2021); *Hasemann v. Gerber Prod. Co.*, 331 F.R.D. 239, 277 (E.D.N.Y. 2019); *Price v. L'Oreal USA, Inc.*, No. 17-CV-614, 2018 WL 3869896, at *10 (S.D.N.Y. Aug. 15, 2018)).)  But Plaintiff overlooks that these proposed analyses were all proffered at the *class certification* stage, not summary judgment.  At class certification, a plaintiff must provide a damages model capable of measuring injury on a class-wide basis.  *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013).  That is different from the inquiry here at summary judgment, where Plaintiff must present admissible evidence from which a jury could determine she suffered actual injury.  *See Kelly*, 2024 WL 1076217, at *10; *Segovia*, 2017 WL 6398747, at *4–5.  Accordingly, Plaintiff's cases do not crack the injury nut.

[10] Plaintiff should not be surprised that Dr. Ingersoll's proposed methodology is insufficient to survive summary judgment.  Indeed, in *Kelly*, Plaintiff's same counsel offered a very similar "proposed" damages model (authored by Dr. Matthews, one of Plaintiff's experts here), which was rejected by the *Kelly* court for the very same reason.  *See* 2024 WL 1076217, at *10 ("Dr. Matthews has not conducted either [the proposed conjoint or hedonic] analysis to date, and a proposal to identify evidence at some yet-to-be-determined date is not sufficient to survive summary judgment when [p]laintiff is required to come forward with admissible evidence to raise a genuine issue of fact for trial." (internal citation omitted)).

56.1 ¶ 36), or even recall at *which* Shoprite she purchased the Product, (Dep. of J. Reyes at 85:2–7; Def's 56.1 ¶ 33; Pl's Resp. 56.1 ¶ 33).  This dearth of evidence is insufficient to overcome summary judgment.  *See Kelly*, 2024 WL 1076217, at *10 (granting summary judgment where "[p]laintiff has not produced any other evidence that could establish that he paid a premium for the Product"); *Colpitts*, 2023 WL 2752161, at *4 (granting summary judgment where "[plaintiff] has not substantiated his allegation that he personally paid a premium for [the product] since he has produced no evidence as to the price he paid for [the product] on any occasion where he purchased [it]"); *see id.* at *1 (noting "[p]laintiff [could] not recall the exact names or locations of [the] retailers" where he purchased the product, "d[id] not have receipts from any of his purchases," and could not "recall the price he paid on any of those occasions"); *Weiner v. Snapple Bev. Corp.*, No. 07-CV-8742, 2011 WL 196930, at *4–5 (S.D.N.Y. Jan. 21, 2011) (granting summary judgment where plaintiff "provided nothing but conjecture as to the prices they paid for Snapple [iced tea]," because plaintiff's testimony that he "probably paid $1.79 plus tax or $1.79 total[,or s]omething around there" was "insufficient to establish the price of Snapple purchased on these occasions").[11]

---

[11] Plaintiff also offers no evidence establishing the prices of *competing* products, which could help establish that she paid a premium for the Product here.  *See Kelly*, 2024 WL 1076217, at *10 (evidence to support a price-premium theory "could have included . . . the prices of competing products with the [allegedly false] representation, but that date is not present here"); *Segovia*, 2017 WL 6398747, at 4 (granting summary judgment where there was no evidence of actual injury because "[p]laintiff did not provide the prices of competing products for comparison, nor did [p]laintiff actually testify at any point in his deposition that but for [d]efendant's lactase-specific claims, he would have been unwilling to pay [d]efendant's prices"); *Weiner*, 2011 WL 196930, at *4 (noting that plaintiffs failed to "identif[y] with sufficient specificity the cost of comparable beverages offered for sale at the time of their Snapple purchases"); *cf. Ebin v. Kangadis Food Inc.*, No. 13-CV-2311, 2014 WL 737878, at *1–2 (S.D.N.Y. Feb. 25, 2014) (denying summary judgment on a GBL § 349 claim where plaintiff produced an expert report and raw data comparing the prices of the product at issue to those of a relevant competitor).

In a last-ditch attempt to survive summary judgment, Plaintiff argues that she does not need to prove she suffered actual injury, as she is seeking statutory damages under GBL §§ 349 and 350 and "New York law does not require that the [actual damages or a price premium] be proven with a specified degree of certitude." (*See* Pl's Opp'n 25 (quoting *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 550 (E.D.N.Y. Mar. 27, 2017)).) Plaintiff misses the point. Although GBL §§ 349 and 350 authorize statutory damages, only those who actually suffer injury are entitled to recover said damages. *See* N.Y. Gen. Bus. L. § 349(h) ("[A]ny person who has been injured *by* reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions."); *id.* § 350-e(3) ("Any person who has been injured *by* reason of any violation of section three hundred fifty or three hundred fifty-a of this article may bring an action in his or her own name to enjoin such unlawful act or practice, an action to recover his or her actual damages or five hundred dollars, whichever is greater, or both such actions."). Accordingly, regardless of the availability of statutory damages at the remedies stage, Plaintiff must still prove that she suffered *actual injury* as a result of Defendant's allegedly false advertising. *See Kelly*, 2024 WL 1076217, at *11 n.11 ("Plaintiff's argument regarding the availability of statutory damages is without merit because he has not proffered any evidence to support his claimed injury."); *Colpitts*, 2023 WL 2752161, at *3 ("Before a plaintiff can recover any damages, whether they be actual or statutory damages, he must first establish each element of his cause of action, and the New York Court of Appeals has explicitly and unambiguously

stated that 'a plaintiff must prove 'actual' injury to recover under the statute.'" (quoting *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (N.Y. 2000))).[12]

Because Plaintiff has not provided any evidence supporting a necessary element of her GBL claims—that she suffered injury—no reasonable factfinder could return a verdict in Plaintiff's favor. Accordingly, Defendant is entitled to summary judgment. *Kelly*, 2024 WL 1072617, at *11 (granting summary judgment where plaintiff offered no evidence demonstrating he suffered an injury); *Segovia*, 2017 WL 6398747, at *4–5 (granting summary judgment because, "[g]iven [p]laintiff's failure to provide evidentiary support for his alleged injury—a necessary element of his GBL claims—there is no factual basis on which a reasonable jury could return a verdict for [p]laintiff"); *Weiner*, 2011 WL 196930, at *5 (granting summary judgment

---

[12] The cases Plaintiff relies on are inapposite and do not change the result. (Pl's Opp'n at 25–26 (citing *Sharpe v. A&W Concentrate Co.*, No. 19-CV-768, 2021 WL 3721392, at *7 (E.D.N.Y. July 23, 2021) (noting, *at class certification*, that statutory damages were "susceptible to common proof," thus establishing predominance); *Kurtz*, 321 F.R.D. at 550 (stating, *at class certification*, that "precise statutory damages can be calculated on a classwide basis" only "*once the injury is established*" (emphasis added)); *In re Scotts EZ Seed Litig.*, No. 12-CV-4727, 2017 WL 3396433, at *9, 9 n.8 (S.D.N.Y. Aug. 8, 2017) (noting that plaintiff "provide[d] some evidence of a price premium," although the "price premium measurement of damages [wa]s less important in light of the fact that statutory damages were available"); *Guido v. L'Oreal, US, Inc*, No. 11-CV-1067, 2013 WL 3353857, at *16 (C.D. Cal. July 1, 2013) (finding, *at class certification*, that because plaintiffs were pursuing statutory damages, "no individualized damages inquiries [were] necessary" to demonstrate predominance")).)

Again, this result should come as no surprise to Plaintiff's counsel, who has unsuccessfully made this precise argument to courts in this District at least twice, *Kelly*, 2024 WL 1076217, at *11 n.11; *Colpitts*, 2023 WL 2752161, at *3, citing the same inapposite cases when doing so, (*see Kelly*, No. 21-CV-8134, Dkt. No. 71 at 10; *Colpitts*, Dkt. 20-CV-2487, No. 103 at 14–15). In its Opinion granting in part Defendant's Motion to Dismiss, the Court noted Plaintiff's counsel has a habit of making previously rejected arguments before this Court and warned counsel that it "[would] not tolerate continued attempts to make . . . argument[s] contrary to prevailing law." *Reyes*, 694 F. Supp. 3d at 429 n.3. Given Plaintiff's counsel's insistence on recycling arguments and methodologies here that have been unanimously discarded by other courts, that warning plainly fell on deaf ears. Make no mistake—this conduct is potentially sanctionable. This is the final warning the Court will give to Plaintiff's counsel.

where "[p]laintiffs have provided nothing but conjecture as to the prices they paid for Snapple and the prices of comparable beverages available for sale at the time of their Snapple purchases").

### 2. Product Label

Plaintiff claims that the product at issue was labeled in a materially misleading way. (Compl. ¶¶ 38–47.)  "In assessing whether an act is materially misleading, the inquiry is whether, objectively, the act is 'likely to mislead a reasonable consumer acting reasonably under the circumstances.'"  *Duran*, 450 F. Supp. 3d at 346 (quoting *Cohen v. JP Morgan Chase & Co*., 498 F.3d 111, 126 (2d Cir. 2007)); *see also Bustamante v. KIND, LLC*, 100 F.4th 419, 426 (2d Cir. 2024) ("Deception is governed by the reasonable consumer standard."); *de Lacour v. Colgate-Palmolive Co.*, No. 16-CV-8364, 2024 WL 36820, at *4 (S.D.N.Y. Jan. 3, 2024) ("[A] deceptive act is one likely to mislead a reasonable consumer acting reasonably under the circumstances." (internal quotation marks omitted)); *Colangelo v. Champion Petfoods USA, Inc*., No. 18-CV-1228, 2022 WL 991518, at *18 (N.D.N.Y. Mar. 31, 2022) (same).  "To establish deception under the reasonable consumer standard at the summary judgment stage, plaintiffs must present admissible evidence establishing how the challenged statement . . . tends to mislead reasonable consumers acting reasonably."  *Bustamante*, 100 F. 4th at 426.  In other words, Plaintiff here must present evidence demonstrating that a reasonable consumer would believe that a product labeled "Made With Almond Oil" or "With Almond Oil" contained a significant, or non-de minimis amount of almond oil, relative to other oils.  Plaintiff has failed to do so.[13]

---

[13] This Court was unwilling to decide this question as a matter of law at the pleading stage, noting it was "plausible" that the "representation that the plant butter is 'Made With [Almond] Oil' could lead a reasonable consumer to conclude that the major plant-based ingredient was [almond] oil."  *Reyes*, 694 F. Supp. 3d at 423–24 (quoting *Clemmons v. Upfield*

First, Plaintiff points to her own purchases of the Product—which she made because she expected it to contain a significant amount of almond oil, and she wanted a "healthy alternative" (Dep. of J. Reyes at 104:25–11, 112:2–13:3, 127:9–13)—as evidence that a reasonable consumer could similarly be misled by the label "With Almond Oil," (Pl's Opp'n 10–11).  But testimony about her state of mind, and hers alone, is insufficient to demonstrate what a reasonable consumer might think.  *See de Lacour*, 2024 WL 36820, at *6 (granting summary judgment where "[n]amed [p]laintiffs have offered nothing to show that their views of the word 'natural' reflect those held by a reasonable consumer, rather than their own subjective beliefs" and noting that "[p]laintiffs cannot rely on [n]amed [p]laintiffs' testimony to demonstrate a reasonable consumer's understanding of 'natural'"); *Colangelo*, 2022 WL 991518, at *25 (granting summary judgment where "[p]laintiff's only evidence for her counterintuitive interpretation of the phrase is her own, unexplained interpretation.  This is not sufficient evidence from which a reasonable jury could conclude that a reasonable consumer would be misled by the phrase or that the phrase is otherwise false."); *Segovia*, 2017 WL 6398747, at *4 (noting that "[w]hether an act is 'materially misleading' within the meaning of the statute is an objective inquiry. . . .  The relevant question is, therefore, not whether [p]laintiff relied on [d]efendant's statements in h[er] own purchasing decision, but whether the conduct is likely to mislead a reasonable consumer acting reasonably under the circumstances." (internal citations and quotation marks omitted)); *cf. Passman*, 671 F. Supp. 3d at 439 (concluding, on a motion for class certification, that "[i]t would

---

*US Inc.*, 667 F. Supp. 3d 5, 17 (S.D.N.Y. 2023)).  But at summary judgment, Plaintiff is required to introduce evidence sufficient to create a triable issue of fact on her claims.  *See Bustamante*, 100 F.4th at 433 ("Although the definitions pled in the [complaint] may have sufficed at the motion to dismiss or class certification stage of litigation, plaintiffs cannot meet their burden on summary judgment 'through reliance on unsupported assertions.'" (quoting *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995))).

not be enough for a plaintiff to assert, based on his or her own subjective belief that defendant's statement . . . conveyed the alleged implied false message, if there were not also evidence that that same understanding was shared by a reasonable consumer" (alterations adopted) (quotation marks omitted)).

Second, Plaintiff relies upon the report of her expert, Dr. Matthews, who was engaged to assess "the extent to which consumer confusion exists regarding how much almond oil is found in Plant Butter Made With Almond Oil like Country Crock," which she accomplished by testing "[w]hether presenting an edited label [that] now states 'With Almond Oil' compared to the original label 'Made With Almond Oil' changed consumer expectations regarding how much almond oil is found in the product." (Pl's Opp'n Ex. 2 at 31:20–32:7 ("Dep. of A. Matthews") (Dkt. No. 51-2).) Dr. Matthews conducted two consumer surveys, the first of which—the Consumer Perception Survey—tested consumers' understanding of the relative amount of almond oil in vegetable oil spreads labeled "Made with Almond Oil" compared to those labeled "With Almond Oil." (Def's 56.1 ¶ 56; Pl's Resp. 56.1 ¶ 56; Matthews Decl. ¶¶ 16–17, 92.) Survey participants were randomly presented with one of four label images: (1) the first version of the Product label originally launched in 2019, featuring the claim "Made With Almond Oil"; (2) a digitally altered version of the first label that omitted the word "Made" but was otherwise identical to the first label; (3) a label identical to the first, except that the Country Crock brand name was replaced with a fictional brand named "First Choice"; or (4) a label identical to the second, but under the fictional "First Choice" brand. (Matthews Decl. ¶¶ 94–97, 143–44; Def's 56.1 ¶¶ 60–63; Pl's Resp. 56.1 ¶¶ 60–63.)[14] After seeing one of the four labels, respondents

---

[14] Dr. Matthews testified that the use of the fictional brand was "[p]retty much" irrelevant to the question of whether or not "Made With Almond Oil" or "With Almond Oil" lead

were then given eight options to answer what they thought the product label communicated, if anything, about how much almond oil was in the Product compared to other types of oil.[15] (Def's 56.1¶¶ 65, 69; Pl's Resp. 56.1 ¶¶ 65, 69; Matthews Decl. ¶ 133–34.)

Based on the results, Dr. Matthews concluded "there was significant confusion with regard to the amount of [a]lmond [o]il present in the Product" when it was labeled "Made with Almond Oil," as 59.4% of individuals who saw the first "Made with Almond Oil" label "believe[ed] that there [was] at least the same amount of [a]lmond [o]il as any other oil in the [P]roduct." (Matthews Decl. ¶¶ 32, 66, 168; Def's 56.1 ¶ 76; Pl's Resp. 56.1 ¶ 76.) Dr. Matthews further concluded that, when shown the label removing the word "Made" from "Made with Almond Oil," a "statistically significant" smaller number of customers believed there was at least the same amount of almond oil as any other oil in the Product. (Matthews Decl. ¶¶ 36, 66, 166; Def's 56.1 ¶ 78; Pl's Resp. 56.1 ¶ 78.)

Dr. Matthews' report is insufficient to demonstrate whether a reasonable consumer would be misled into believing there was a significant or non-de minimis amount of almond oil, relative

---

consumers to believe the Product contained a certain amount of almond oil, as the effect of removing "Made" was consistent in both the Country Crock and First Choice scenarios. (Dep. of A. Matthews at 155:11–56:3.)

[15] The options were:

(1) 'There is NO almond oil in the product,' (2) 'Almond oil is present in a SMALLER quantity than any other type of oil in this product,' (3) 'Almond oil is present in ABOUT THE SAME quantity as any other type of oil in this product,' (4) 'Almond oil is present in a LARGER quantity than any other type of oil in this product,' (5) 'ALL of the oil in this product is almond oil,' (6) 'Don't know,' (7) 'None of the above,' and (8) 'The product label is not communicating anything about how much [a]lmond [o]il is present in the product.'

(Def's 56.1 ¶ 69 (quoting Matthews Decl. ¶ 134); Pl's Resp. 56.1 ¶ 69.)

to other oils, in the Product Plaintiff purchased.  It is undisputed that Plaintiff only purchased the "With Almond Oil" version of the Product.  (*See* Def's 56.1 ¶¶ 29, 32; Pl's Resp. 56.1 ¶¶ 29, 32.) It is also undisputed that Dr. Matthews assessed whether removing the single word "Made" changed consumer perceptions of amount of almond oil relative to other oils in the Product. (Dep. of A. Matthews at 87:16–88:8, 89:6–90:10, 99:6–22; Def's 56.1 ¶ 79; Pl's Resp. 56.1 ¶ 79; Matthews Decl. ¶¶ 35–36 (analyzing whether changing the label "decreases belief that there is at least the same amount of Almond Oil as any other oil in the Product").)  It is further undisputed that Dr. Matthews did not assess whether either version of the Product label was misleading as to the *amount* of almond oil in the Product, (Dep. of A. Matthews at 160:23–61:6 (testifying it was "beyond the scope of what [she was] asked to test" to determine whether her conclusions suggested a reasonable consumer would believe that the Product contained a non-de minimis amount of almond oil); *see id.* at 92:10–93:14, 94:13–18 (testifying she "was not asked to conclude whether the 'With Almond Oil' label was misleading"); Def's 56.1 ¶ 80, 86; Pl's Resp. 56.1 ¶ 80, 86), and did not assess whether the phrase "With Almond Oil" misled reasonable consumers as to the amount of almond oil in the Product, particularly as compared to competitor labels or other labels that said nothing about almond oil, (Dep. of A. Matthews at 92:10–93:14, 94:13–18 (admitting she could not "make statements about 'With Almond Oil' compared to something that does not say anything about almond oil"); Def's 56.1 ¶ 80, 86; Pl's Resp. 56.1 ¶ 80, 86).  Accordingly, Dr. Matthews' report says nothing about whether consumers were confused about whether there was or was not a significant amount of almond oil, relative to other oils, in the Product purchased by Plaintiff.

Dr. Matthews' second survey—the Consumer Preference Survey—fares no better.  In this survey, Dr. Matthews presented respondents with three vegetable oil spreads, all marketed as

"made with almond oil," and each represented as containing four different types of oil in varying amounts. (Matthews Decl. ¶¶ 104–06, 145–49.) Based on respondents' choice of which spread they would prefer to purchase, Dr. Matthews concluded that "the amount of [a]lmond [o]il present in a vegetable oil spread matters to a sizable proportion of the target market for the Product." (*Id.* ¶¶ 168; *id.* ¶ 70.) But even accepting the results of this survey as true, they say nothing about what a reasonable consumer understands a "significant" or "non de-minimis" amount of almond oil to be, let alone what amount of almond oil actually existed in the Product so to render the label misleading. *See Bustamante*, 100 F.4th at 434 (affirming district court and noting "[w]ithout evidence of a reasonable consumer's understanding of 'All Natural,' plaintiffs cannot succeed on their claims at summary judgment"); *In re KIND LLC "Healthy & All Natural" Litig.*, 627 F. Supp. 3d 269, 285 (S.D.N.Y. 2022) (granting summary judgment where "Plaintiffs . . . have not . . . articulated before this Court a viable theory for why the challenged KIND products are not within a reasonable consumer's understanding of 'All Natural.'"). In other words, although Dr. Matthews may have demonstrated that "a large majority of consumers . . . would rather purchase vegetable oil spreads that included at least the same amount of [a]lmond Oil as any other oil in the Product compared to spreads that included less [a]lmond Oil than other types of oil," (Matthews Decl. ¶ 167), she did not demonstrate that a reasonable consumer would be misled as to the amount of almond oil in *this* Product.

Accordingly, Plaintiff has failed to introduce any evidence sufficient to create an issue of triable fact as to whether Defendant engaged in materially misleading activity and thus, summary judgment is warranted on this independent ground. *See Bustamante*, 100 F. 4th at 434 ("Because plaintiffs failed to produce admissible evidence demonstrating what a reasonable consumer, acting reasonably, would expect of KIND products bearing the 'All Natural' label, we hold that

the District Court did not err in granting summary judgment in favor of KIND."); *KIND*, 627 F. Supp. 3d at 292 ("Even if we were to accept the argument that [the expert] report established a reasonable consumer's understanding of the 'All Natural'" representation, plaintiffs' claims would still not survive the motion for summary judgment for the independent reason that plaintiffs have not shown that any KIND product claiming to be 'All Natural' contains 'artificial or synthetic' ingredients or any of the chemicals [the expert] listed.").[16]

III. Conclusion

For the foregoing reasons, Defendant's Motion is granted.

The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 46), enter judgment for Defendant, and close this case.

SO ORDERED.

Dated:     March 12, 2025
           White Plains, New York

 

_____
                KENNETH M. KARAS
              United States District Judge

---

[16] To demonstrate that the Product was misleadingly labeled, Plaintiff points to certain FDA regulations that provide for how labels on "[m]ixtures of edible fat or oil and olive oil" should include specific percentages of the various components of the mixture. (Pl's Opp'n at 11–12 (citing 21 C.F.R. §§ 102.37, 102.5(b)(2))). But the regulation Plaintiff cites only applies to mixtures containing "less than 100 percent and more than 0 percent olive oil," 21 C.F.R. § 102.37, which does not include the Product at issue here, (*see* Def's 56.1 ¶ 21 (describing the Product as containing soybean, palm kernel, almond, and palm fruit oil); Pl's Resp. 56.1 ¶ 21 (same)).